1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

8

9

10

11

12

13

NORTHWEST ADMINISTRATORS, INC.,

               Plaintiff,

v.

MURREY'S DISPOSAL COMPANY, INC., et al.,

               Defendants.

No. CV04-1714P

ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY
JUDGMENT AND DENYING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

14

15

16

17

18

19

20

21

     This matter comes before the Court on the parties' cross-motions for summary judgment (Dkt. Nos. 11 and 17).  In considering these motions, the Court has reviewed all materials submitted in support of and in response to these motions.  Having considered all relevant materials, and having heard oral arguments from the parties on June 28, 2005, Plaintiff's motion is hereby GRANTED, while Defendants' motion is DENIED.  The Court finds that the mailing of Plaintiff's acceptance of the 1999 labor agreement to the wrong address does not render the Employer-Union Pension Certification invalid.  The Court also finds that strike replacements are covered under the language of the labor agreement and that Defendants should have made pension contributions on their behalf.

22

BACKGROUND

23

24

25

26

     Plaintiff Northwest Administrators, Inc., ("NWA") administers the Western Conference of Teamsters Pension Plan ("the Trust"), a trust jointly governed by participating employers and union members for the benefit of union members.  Defendants Murrey's Disposal Company Inc. and American Disposal Inc. ("Defendants") are waste removal companies who hired members of

ORDER - 1

Teamsters' Local 313 ("the Union") and made payments on these workers' behalf to the Trust.  As part of the 1996-1999 labor agreement between the Defendants and the Union, they signed an "Employer-Union Pension Certification" ("EUPC") subscription agreement that obligated Defendants to make these pension contributions.  In 1994, NWA had revised its standard EUPC forms to include new language that obligated employers to continue making trust payments during the gap between the expiration of one labor agreement and the signing of a new one.  Defendants and the Union signed an EUPC that included this revised language.  This clause was designed to protect employees' pensions during labor disputes and the contract negotiation process.  It reads:

> . . .The employer agrees to pay the trust fund the pension contributions specified in the labor agreement with the union.  The undersigned union and employer shall become parties to said agreement and declaration of trust upon acceptance as such by the trustees.  Upon the expiration of this or any subsequent labor agreement, the employer agrees to continue to contribute to the trust fund in the same amount and manner as required in the most recent expired labor agreement until such time as the undersigned either notifies the other party in writing (with a copy to the trust fund) of its intent to cancel such obligation five days after receipt of notice or enters into a successor labor agreement which conforms to the trustee policy, whichever event occurs first.  Similarly, the trustees reserve the right to give notice to the employer and union of intent to terminate acceptance of further contributions from the employer.  The undersigned agrees that upon renewal of the labor agreement a complete copy of the renewed labor agreement, including modifications to the agreement, will be furnished to the area administrative office as soon as available; and, upon written acceptance of the renewed labor agreement by the trustees, the foregoing terms of the employer-union pension certification shall be applicable to such renewal of the labor agreement.  (Grimm Decl. at 88).

In 1999, the parties negotiated a successor labor agreement that expired on September 30, 2002.  Defendants claim that after the execution of this agreement, they received no written acceptance from NWA of their labor agreement.  This acceptance was not received because NWA mailed the June 15, 2000, acceptance letter to 4622 70th Avenue. Puyallup, WA 98371, which stopped being Defendants' address in 1997.  (Ditter Decl., Ex. J at 114). Plaintiff alleges that Defendants did not notify it that this address was no longer valid. (Pl's Resp. at 2). Defendants, however, state that Plaintiff knew the correct address.  To prove this point, Defendants note that NWA sent a letter to Defendants at their correct address–P.O. Box. 399 Puyallup, WA 98371–on May 25, 2000. (Ditter Decl., Ex. H at 109).

1   The record reflects that previous to 1997, the parties used both addresses to correspond with each

2   other.

3   As a result of this mix-up, Defendants claim that their contractual relationship with NWA

4   under the EUPC was never renewed after the 1999-2002 labor agreement with the Union went into

5   effect.  Nonetheless, Defendants continued to make contributions to the Trust, as outlined in their

6   labor agreement with the Union.

7   When the time came to negotiate a new labor agreement in September, 2002, the Union and

8   Defendants disagreed on some aspects of the new agreement, and the Union struck Defendants.

9   Although some regular drivers and helpers crossed the picket line, the Defendants found it necessary

10   to hire some strike replacements in order to complete their trash collection obligations.  Defendants

11   continued to make pension contributions for the workers who crossed the picket line.  They made no

12   contributions on behalf of the strike replacements.

13   In July, 2003, the Union withdrew its representation of Defendants' employees.  As a result

14   of the Union's withdrawal, NWA conducted an audit of Defendants that covered the period from

15   January 1, 2001, to July 31, 2003.  (Ditter Decl. at ¶31).  During this audit, NWA found that

16   Defendants had not made contributions on behalf of the strike replacements they had hired during the

17   strike.  NWA found that all other contributions were complete.  NWA brought this action under

18   ERISA (29 U.S.C. §1132) to collect the strike worker contributions from Defendants, which it claims

19   Defendants owe to the Trust under the terms of the EUPC and Defendants' labor agreements with the

20   Union.  Defendants claim that there is no language in either of these contracts that covers strike

21   replacements.  Further, they claim that the EUPC did not apply to the 1999-2002 labor agreement

22   because Defendants never received NWA's acceptance of that agreement.

ANALYSIS

23

24   I.  Summary Judgment Standard

25   This matter is before the Court on the parties' cross- motion for summary judgment.

26   Summary judgment is not warranted if a material issue of fact exists for trial.  <u>Warren v. City of</u>

Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995), cert. denied, 516 U.S. 1171 (1996).  The underlying facts are viewed in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  "Summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The party moving for summary judgment has the burden to show initially the absence of a genuine issue concerning any material fact.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970). However, once the moving party has met its initial burden, the burden shifts to the nonmoving party to establish the existence of an issue of fact regarding an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  To discharge this burden, the nonmoving party cannot rely on its pleadings, but instead must have evidence showing that there is a genuine issue for trial.  Id. at 324.

II.  Enforceability of the EUPC

The first argument that Defendants make that they claim shields them from paying pension contributions for the strike replacements is that the EUPC is unenforceable because it had expired by the time the strike replacements were hired.  They assert that the fact that they continued to pay contributions for non-strike-replacements after September 2002, should not create a quasi-contractual duty to pay the strike replacements.  They argue that, based on the language of the EUPC, the agreement expires when: 1) a party to the agreement gives another party five days notice of its intent to cancel, or 2) when a successor labor agreement that conforms to Trust policy is adopted. Defendants posit that in this case, the second event took place and the EUPC was never renewed because the Trustees' acceptance of the new labor agreement was mailed to the wrong address.  This mistake made Defendants unable to accept the renewed EUPC.  Defendants cite Restatement of

Contracts §66[1] in support of their argument.  Plaintiffs argue that ERISA §515 eliminated technical contract defect defenses to agreements like the EUPC in this case.

A.  Subsequent Behavior

Defendants argue that the fact that they continued to make pension contributions, after the expiration of the labor agreement, should not be construed to create a contractual obligation for them to pay strike replacements who were hired at that time.  They state that the National Labor Relations Act required them to continue making payments for workers who crossed the picket line after the expiration of the 1999-2002 labor agreement, but not for strike replacements hired at that time. When an employer and union enter into negotiations for a new labor agreement, "a [collective bargaining agreement] does not "survive" in the sense that it continues as a legally operative document; rather, the agreement's terms "survive" in order to define the parameters of the employer's obligation under §§8(a)(5) [of the NLRA] to maintain the status quo during negotiations." Laborers' Health and Welfare Trust v. Lightweight Concrete Co., Inc., 779 F. 2d 497, 500 (9th Cir. 1985). Defendant also cites NLRB decisions that support the idea that an employer is liable for employee pension contributions until the employer and union reach an impasse in negotiations. Ryan Iron Works, 332 NLRB No. 49 (2000). Under Defendants' theory of EUPC expiration, they should not have been obligated to pay anything at all under the contract, once the labor agreement had expired in September, 2002.  However, they did have a statutory obligation under the NLRA.  While Defendants' analysis of their NLRA obligations is correct, case law in this area favors ruling that

---

[1]Restatement of Contracts §66 provides that: "[a]n acceptance is authorized to be sent by the means used by the offeror or customary in similar transactions at the time when and the place where the offer is received, unless the terms of the offer or surrounding circumstances known to the offeree otherwise indicate." 2 Williston on Contracts §6:35 (4th ed. 2004). Here, it is an issue fact whether or not Plaintiff knew that the address to which it was supposed to send its acceptance of Defendants' labor agreement with the Union had changed. This issue of fact is not material to the outcome of these cross-motions, however (infra).

1  NWA's mailing of its acceptance of the 1999-2002 labor agreement to the wrong address was not

2  fatal to the contractual validity of the EUPC.

3         B.  Defect in Formation and §515 of ERISA

4            Section 515 of ERISA gives the Court jurisdiction to entertain actions by trustees to

5  enforce their independent contractual agreements, such as the EUPC in this case, with employers,

6  instead of merely being treated as third party beneficiaries under the labor agreement between the

7  employer and the union.  Central States, Southeast and Southwest Areas Pension Fund, et al. v.

8  Marine Contracting Corp., 878 F. Supp. 1176, 1179 (N.D. Ill. 1995).  The statute  provides:

9            Every employer who is obligated to make contributions to a multi-employer plan
   under the terms of the plan or under the terms of a collectively bargained agreement

10            shall, to the extent not inconsistent with law, make such contributions in accordance
   with the terms and conditions of such plan or such agreement.  29 U.S.C. §1145.

11

12  This provision of law was also enacted to simplify litigation by trustees to collect delinquent

13  contributions owed by employers by limiting the contract formation defenses available to employers.

14  Central States, Southeast and Southwest Areas Pension Fund v. Independent Fruit and Produce Co.,

15  919 F. 2d 1343, 1348 (8th Cir. 1990).  Defendants attempt to discredit Plaintiff's argument by stating

16  that the law does not apply to this case in the way that Plaintiff would have the Court construe it.

17            While it is true that many of the cases Plaintiff cites address disputes regarding the underlying

18  validity of the labor agreement between the employer and union, Pattern Makers' Pension Trust Fund

19  v. Badger Pattern Works, Inc., presents an analogous situation to the case at hand. 615 F. Supp. 792

20  (N.D. Ill. 1985). In Badger, the employer challenged the plaintiff trust's assertion that it owed the

21  trust contributions for strike replacements.  The defendant based its argument on the fact that its

22  contribution employers' agreement (CEA) with the trust had never been signed by the trustees. The

23  defendant argued that plaintiff's failure to properly execute the contract was a defect that rendered it

24  unenforceable. Id. at 802.  The Badger court called the employer's defense a "technicality"and upheld

25  the contract.  Id.  The court found that the original CEA had been properly executed, but that the

26  second CEA renewing the agreement lacked a signature.  Id.  Nevertheless, the court found that the

first document governed the employer's obligations until the employer received written notice from the trust of its revocation.  Id.  The Badger defendant was, therefore, held liable for damages under ERISA §515.

The Western District of Washington adopted the Badger court's logic in Painter's Trust, Western Washington v. Sandvig Ostergard, Inc.. 737 F. Supp. 1131 (1990).  In that decision, the court decided that an employer's obligations under its counterpart agreement with a trust continued until one of the parties to the counterpart agreement explicitly gave the other party written notice of termination, even where no explicit continuation language was included in the counterpart agreement. Id. at 1137.

In the case at hand, the relevant clause in the EUPC contains language that obligates the employer to continue to contribute until either the employer, the union, or the trust gives written notice of its revocation of the agreement.  Additionally, the Trust's Procedures for Perpetual Employer-Union Pension Certificate, Procedures for Expired Labor Agreements, and Amendments to Related Procedures states: "[t]he [1994] revisions [to the EUPC] provide that once the [EUPC] is executed, the employer agrees to continue to contribute to the Trust Fund in the same amount and manner as required in the most recent expired labor agreement until such time as one party to the agreement notifies the other in writing of its intent to cancel such obligation. . ." (Grimm Decl. at 91). The parties agree that no such notice was given until July, 2003, when the Union withdrew its representation rights with regard to Defendants' employees.  Moreover, NWA has a series of letters that it sends out if a labor agreement does not meet the Trust's standards. (Grimm Decl. at 100-103). Defendants should have expected these letters, had the labor agreement been unacceptable. Defendants have presented no evidence that they received any of these letters.

Finally, both parties have submitted documents that show that the use of two separate addresses--a street address and a P.O. Box--was "customary" regarding correspondence between the two parties.  The Court finds that Plaintiff's mailing of the letter to Defendants' street address

conforms to the parties' usual customs and  satisfies Restatement of Contracts §66's requirements

regarding the mailing of acceptance.

III.  The Language of the Contract Covers Strike Replacements

Defendants' second argument against Plaintiff's claim that it is owed contribution money for

the strike replacements who were hired in 2002 is the fact that neither the EUPC nor the underlying

labor agreement anywhere mentions "strike replacements" explicitly.  Plaintiff bases its argument that

the strike replacements were covered on language in the preamble to the labor agreement, which

reads: "The execution of the Agreement on the part of the Employer shall cover Truck Drivers and

[all] Helpers engaged in refuse pickup within the area located within the jurisdiction of Local 313. . ."

(Grimm Decl. at 55, as modified by Grimm Decl. at 84).  Plaintiffs argue that this broad language

allows for coverage of anyone doing the work of the bargaining unit.  Defendants counter that

nowhere does the labor agreement or the EUPC mention the work of the bargaining unit.  Defendants

further argue that neither Defendants nor the Union intended for these agreements to cover strike

replacements.  They submit affidavits from the relevant negotiators on each side to support this

position.  (See Aff. of Swanson, Aff. of Hawkins, Aff. of Chambliss).

A.  NWA's Policy Regarding Strike Replacements

The Defendants argue that NWA's own written policy regarding strike replacements should

prevent this Court from deciding that either the labor agreement or the EUPC obligated the

Defendants to make pension contributions on behalf of strike replacements. The Trust's policy on

contributions during strikes and lockouts provides: "in the case of a strike or lockout the parties

would still have the option, by written agreement, to waive or not waive pension contributions on

behalf of the employees who work during the strike or lockout." Here, Defendants point out that

there was no agreement at all, written or oral, between the employers and the Union.  Without any

agreement, the Court cannot find that there was an intent for Defendants to make contributions on

behalf of strike replacements.  Defendants seem to ignore the fact that this argument can cut both

1    ways: without an agreement, the Court cannot find that there was an intent to waive strike

2    replacement contributions.

3            Plaintiff argues that without an agreement regarding strike replacements, the Court's analysis

4    of which workers were covered should be guided by the plain language of the labor agreement.  As

5    stated above, the preamble to the labor agreement refers to "[t]ruck Drivers and all Helpers."

6    Plaintiff asserts that this broad classification should apply to all individuals engaged in the work of the

7    bargaining unit.  This logic, they argue, would extend the labor agreement's contribution provisions

8    to include strike replacements engaged as replacement Truck Drivers or helpers.  Defendants counter

9    this argument by noting that "bargaining unit work" is referred to nowhere in the labor agreement.

10   To bolster this argument, they cite the Badger decision, previously mentioned in this memo.  The

11   Badger court held that the employer in that case was liable for trust contributions on behalf of strike

12   replacements because they qualified as "employees" under a definitional clause in the underlying labor

13   agreement.  615 F. Supp. at 803.  In the labor agreement at issue in this case, there is no definitional

14   clause that defines "employee."  (Grimm Decl., Ex. G).  Rather, the preamble merely identifies the

15   labor agreement as applying to "[t]ruck Drivers and [all] Helpers."(Grimm Decl. at 55, as modified by

16   Grimm Decl. at 84).

17          The Court finds that this broad classification covers any worker engaged in doing Truck

18   Driver or Helper work, which includes strike replacements.  Using similar logic, the Western District

19   of Washington held in Sandvig-Ostergard that an employer who was bound to make trust

20   contributions on behalf of employees cannot unilaterally choose to make those contributions on behalf

21   of some employees and not for others.  737 F. Supp. at 1140.

22          B.  Does the Intent of the Parties Supersede the Plain Language of the Contract?

23          Defendants claim that the Court must look to the intent of the parties regarding coverage of

24   strike replacements because the language of the contract is ambiguous. In order to enter into this

25   inquiry, the Court must first decide whether the labor agreement is ambiguous on its face.  Where a

26   contract is not clear on its face, the contract interpretation will depend on the intent of the parties to

1   the contract.  <u>Santa Monica Culinary Welfare Fund v. Miramar Hotel Corp.</u>, 920 F. 2d 1491, 1494

2   (9th Cir. 1990).  Here, the Court does not find that the designation of "Truck Drivers and All Helpers"

3   is ambiguous (Grimm Decl. at 55, as modified by Grimm Decl. at 84).  The terms contained in this

4   language is simple and straightforward.  Accordingly, the Court will not enter into an inquiry

5   regarding the intent of the parties surrounding those terms.

6   <u>VI.  Relief Demanded by NWA</u>

7          Plaintiff states that under its contracts with Defendants, Murrey's is obligated to NWA for

8   contributions in the amount of $132, 799.27 that it has not yet paid.  Murrey's is also obligated to the

9   Trust for liquidated damages of $26,719.00, plus interest accruing until paid in full and attorney's fees

10  and costs.  American Disposal Co. is obligated to NWA for contributions amounting to $262.02,

11  which it has not yet paid, plus liquidated damages equaling $52.40, plus, interest, attorney's fees and

12  costs.  ERISA §502(g) provides that the remedies of delinquent contributions, liquidated damages,

13  interest, attorney's fees and costs are mandatory and "shall" be awarded to a prevailing Trust that is

14  suing to collect delinquent contributions from a subscribing employer. 29 U.S.C. §1132(g).  For this

15  reason, the Court awards Plaintiff its requested relief.

16                                 CONCLUSION

17         The Court finds that the EUPC between the Trust and employer in this case remained valid

18  and that the underlying labor agreement required contributions on behalf of strike replacements

19  working as truck drivers and helpers.  Accordingly, Plaintiff is awarded the relief that it has requested,

20  as well as attorney's fees and costs as provided under the statute.  The Court GRANTS summary

21  judgment in Plaintiff's favor and DENIES Defendants' summary judgment motion.  There being no

22  further issues before the court in this case, the Court DISMISSES this case with prejudice.

23  The Clerk of the Court shall direct a copy of this order be sent to all counsel of record.

24         Dated: July 8, 2005.

25                                          Marsha J. Pechman
                                            United States District Judge

26

ORDER - 10